# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### GALVESTON DIVISION

| | | |
|---|---|---|
| H. Stuart Campbell, Jr., | § | |
| | § | |
| v. | § | Civil Action No. 3:20-cv-00090 |
| | § | |
| Texas Tea Reclamation, LLC, *et al.* | § | |

---

**Plaintiff's Response in Opposition to Texas Tea Reclamation, LLC's Motion to Dismiss Counts 30-33, 36, and 37 of Plaintiff's Second Amended Complaint**

---

H. Stuart Campbell, Jr., as Executor of the Estate of H. Stuart Campbell, Sr., responds in opposition to Defendant Texas Tea Reclamation, LLC's motion to dismiss.[1] [Doc No. 31]. Campbell, Jr. has sufficiently pleaded plausible claims for relief against the Defendants for their misconduct in connection with Campbell, Sr.'s $4.375 Million investment in Texas Tea. Texas Tea and its two members have hidden and shielded the true extent of their unlawful and fraudulent conduct, and yet Defendants complain about Campbell, Jr.'s detailed allegations which, of course, are made without the benefit of the information Campbell, Jr. has requested of Defendants and which only the Defendants possess themselves. Having stated plausible claims for relief against each defendant, and Defendants failing to show that Campbell, Jr.'s claims have "no reasonably founded hope of substantiation, even after a long and expensive discovery process," dismissal is improper and the Court should deny Defendants' Motion.

---

[1] Defendants Dymra Henderson Williams and John E. Williams III joined in Texas Tea's Motion to Dismiss. [Doc. No. 32]. In addition to joining Texas Tea's motion to dismiss, the Williamses filed their own motion to dismiss Counts 29 and 35 [Doc. No. 33]. Campbell, Jr. will respond separately to the Williamses' standalone motion.

## INTRODUCTION

This case arises out of Texas Tea and the Williamses' fraudulent actions intended to induce Campbell, Sr. to invest millions of dollars into their struggling business, and Defendants' subsequent misuse of the loaned funds. The Williamses are Texas Tea's only members, and the Williamses are responsible for, and run, Texas Tea's business operations. After enticing Campbell, Sr. to invest $2 Million in Texas Tea, Texas Tea and the Williamses re-approached Campbell, Sr. for more money-claiming Texas Tea needed an infusion of money to operate the business. For more than two years from December 2015 to August 2018, the Williamses approached Campbell, Sr. to request more money from him to support Texas Tea's legitimate business operations. The Williamses concealed from Campbell, Sr. their intention to use Campbell, Sr.'s money to pay for non-Texas Tea debts and expenses, including the Williamses' unpaid and overdue tax bill, and to unreasonably and unjustly line their own pockets and unjust enrich themselves at Campbell, Sr.'s expense.

When Campbell, Sr. passed away, the Williamses promised Campbell, Jr. that the Williamses would provide the Estate with Texas Tea's financial information to allow Campbell, Jr. to assess Texas Tea's business operations. But the Williamses' promise was short-lived. After the Williamses retreated back to Texas from Campbell, Sr.'s funeral proceeding, the Williamses refused to turn over information that would shine the light on their misdeeds and fraudulent conduct. Then, after Campbell, Jr. filed this lawsuit complaining about their actions, Texas Tea has continued to block Campbell, Jr.'s discovery efforts. Quite tellingly, Texas Tea refuses to disclose all of the payments it made to the Williamses during the years they were repeatedly inducing Campbell, Sr. to loan the business more money. In

2

fact, Texas Tea refuses to either admit or deny that Texas Tea paid the Williamses any amount of money beyond the distributions Texas Tea recorded on the Williamses' annual K-1 forms. Campbell, Jr. certainly does not have access to the information that Defendants are trying so hard to shield from Campbell, Jr. And yet Defendants complain about Campbell, Jr.'s detailed allegations anyway.

Had the Williamses not concealed information from Campbell, Sr. about their intent to transfer his money to the Williamses, individually, and to use his money for non-business-related expenses, Campbell, Sr. would not have repeatedly loaned Texas Tea and the Williamses another $2.375 Million.

While hiding the very evidence of their fraudulent transfers and fraudulent conduct, the Defendants have asked the Court to dismiss Counts 30–33, 36, and 37 in Campbell, Jr.'s Second Amended Complaint. These counts relate to Campbell, Jr.'s claims for fraudulent transfers and conveyances, fraud, and negligent misrepresentation. Defendants' motion seeks to erect a impenetrable barrier to the discovery process that neither Rule 12(b)(6) nor 9(b) creates. Campbell, Jr. has sufficiently pleaded his claims for relief and alleged the requisite specificity to maintain his claims against the Defendants. Having done so, the Court should deny Defendants' motion and require Texas Tea to respond to Campbell, Jr.'s outstanding discovery requests.[2]

---

[2] Campbell, Jr. requested a pre-motion conference with the Court prior because Texas Tea objected to producing documents that are in its exclusive possession and which will spotlight the Defendants' unlawful conduct and fraudulent transfers of Campbell, Jr.'s money from Texas Tea to the Williamses. *See* [Doc. No. 26]. The Magistrate Judge held a pre-motion conference on September 1, 2020, and elected to defer discovery on Campbell, Jr.'s claims (except for his breach of contract claim) until after the Court resolved Defendants' then-forthcoming motions to dismiss. Campbell, Jr.'s discovery requests are proper, and Texas Tea should be compelled to respond to them.

## PLEADING STANDARDS FOR MOTIONS TO DISMISS

"Motions to dismiss are viewed with disfavor and are rarely granted." *Test Masters Educ. Servs., Inc. v. Singh,* 428 F.3d 559, 570 (5th Cir. 2005). Rule 8 only requires "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). It does not require "an inordinate amount of detail or precision." *Gilbert v. Outback Steakhouse of Fla. Inc.*, 295 F. App'x 710, 713 (5th Cir. 2008).

Campbell, Jr.'s complaint includes factual matter that, when accepted as true, states a claim for relief that is "plausible." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The factual matter is taken as true, viewed in a light most favorable to Campbell, Jr., and need only allow the Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The right to relief must rise above the speculative level. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Put another way, Campbell, Jr. need only "nudge[] [his] claims across the line from conceivable to plausible" *Id.* at 570.

Campbell, Jr.'s detailed allegations supporting his fraud-related and negligent misrepresentation claims raise plausible claims. But even if the Court subjectively believed Campbell, Jr.'s claims were "improbable" or unlikely to succeed (an impression the Court should not reach), the Court still should deny Defendants' motion. The Supreme Court has guided courts in this regard and made clear that, "of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Twombly*, *Id.* at 556. "The plausibility standard is not akin to a 'probability requirement.'" *Iqbal*, 556 U.S. at 678. Campbell, Jr. has pleaded facially plausible claims for relief against Texas Tea and the Williamses.

Rule 9(b)'s heightened pleading requirement does not change this result. "Rule 9(b) supplements but does not supplant Rule 8(a)'s notice pleading" standard. *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009). The rule requires claimants to plead fraud claims with particularity, but what constitutes particularity necessarily differs with the facts of each case. FED. R. CIV. P. 9(b); *Benchmark Elecs., Inc. v. J.M. Huber, Corp.*, 343 F.3d 719, 724 (5th Cir. 2003). Rule 9(b) does not "reflect a subscription to fact pleading" and requires only "simple, concise, and direct" allegations of the "circumstances constituting fraud." *Id.* (quoting *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir. 1997)). Campbell, Jr. does not have the burden at this stage of the case to prove his claims. *See Rivers & Hills Hosp. Group, LLC v. GTB Rest. Tex., LLC*, 2020 WL 129104, at *3 (W.D. Tex. 2020). Moreover, Campbell, Jr.'s allegations do not reflect that his claims lack any "reasonably founded hope of substantiation," even after the discovery process, so the Court should deny Defendants' motion for this reason as well. *See Colonial Oaks Assisted Living Lafayette, L.L.C. v. Hannie Dev'l, Inc.*, 972 F.3d 684, 687 (5th Cir. 2020).

**ARGUMENT AND AUTHORITIES**

1.     **Campbell, Jr.'s Second Amended Complaint Adequately Pleads His Fraud-Related Claims and Negligent Misrepresentation Claims.**

Texas Tea and the Williamses have hidden their actions from Campbell, Jr.—both before Defendants forced Campbell, Jr. to file this lawsuit and throughout the pendency of the case. After the Williamses promised to provide Campbell, Jr. with Texas Tea's financial information, the Williamses backtracked and have masked their misdeeds. [Doc. 30] Second Amended Complaint ¶¶ 57–58. Then, after asserting his claims against Texas Tea and the Williamses, Defendants have refused to disclose the payments the Williamses paid to

themselves from Texas Tea's coffers, which were lined with Campbell, Sr.'s money that was promised to be used on Texas Tea's legitimate business operations. In inducing Campbell, Sr. to loan Texas Tea nearly $2.4 Million *more* dollars, the Williamses concealed the fact that they were facing significant individual tax assessments and penalties owed to the Internal Revenue Service and a government lien on their real property, or that the Williamses would use Campbell, Sr.'s money to pay their personal income tax obligations or to buy a home that is now appraised at nearly $700,000. *Id.* ¶84. Defendants tellingly refuse to disclose any of the other amounts they paid themselves from Texas Tea and will continue to conceal their misconduct until the Court orders Defendants to unmask it.

Campbell, Jr. complied with Rule 9(b) when pleading his claims for fraud and fraudulent transfer, and Campbell, Jr. has provided adequate notice of his claims to Defendants. One of the Rule's central purposes is to provide a defendant with fair notice of the claim and inform the defendant of the act of which the plaintiff complains to enable the defendant to prepare a response. *See United States, ex rel., Rigsby v. State Farm Fire & Casualty Co.*, 794 F.3d 457, 467 (5th Cir. 2015).

The particularity called for by Rule 9(b) differs with the facts of each case. *Tuchman v. DSC Commc'ns. Corp.*, 14 F.3d 1061, 1067–68 (5th Cir. 1994). Rule 9(b) does not require "fact pleading," only "simple, concise, and direct" allegations of the circumstances constituting the fraud. *Id.* Rule 9(b) requires plaintiffs to allege the nature of the fraud and "a brief sketch" of how the fraudulent scheme operated. *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 540 F. Supp. 2d 759, 765 (S.D. Tex. 2007). Campbell, Jr. has done more than that and painted a portrait of the Williamses lining their pockets with Campbell, Sr.'s money that the Williamses

represented would be used for Texas Tea's business operations. To be sure, Campbell, Jr. need not allege every misrepresentation in his pleading. *Gen. Elec. Capital Corp. v. Posey*, 415 F.3d 391, 397 n.7 (5th Cir. 2005). Further, the pleading obligations are relaxed when, as is unquestionably the case here, the facts relating the fraud are peculiarly within the perpetrator's own knowledge and control. *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 540 F. Supp. 2d at 766 ; [Doc. 30] Second Amended Complaint ¶¶ 58–59.

## 1.1 The Second Amended Complaint pleads claims with sufficient particularity to satisfy Rule 9(b)'s flexible and contextual standard.

Rule 9(b) provides that parties alleging fraud should "state with particularity the circumstances constituting fraud." FED. R. CIV. P. 9(b). While the Fifth Circuit long ago commented that generally, when plaintiffs allege claims for fraud, they should state the time, place, and contents of the false representations, *See Williams v. WMX Techs., Inc.*, 112 F.3d 175, 177 (5th Cir. 1997), it has also explained that the "'time, place, contents, and identity standard' is not a straitjacket for Rule 9(b)." *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009). Instead, Rule 9(b)'s pleading requirements are "context specific and flexible." *Id.* Thus, "[a] complaint need not . . . state all facts pertinent to a case in order to satisfy the requirements of Rule 9(b)." *Jag Media Holdings, Inc. v. A.G. Edwards & Sons, Inc.*, 387 F. Supp. 2d 691, 703 (S.D. Tex. 2004).

This makes even more sense when plaintiffs allege fraudulent concealment or nondisclosure. In those situations, plaintiffs need not plead a misrepresentation because the fraud concerned coverups and omissions. Instead, in such cases, plaintiffs need only plead what the defendant failed to disclose. *See, e.g., Silverman v. Watson Pharms.*, 2010 WL 11469548, at *4, *5 (S.D. Tex. 2010) (denying the defendant's motion to dismiss and motion for more

definite statement attacking, among other things, the plaintiff's assertion of fraudulent concealment).

Moreover, when, as here, the facts of the alleged fraud are particularly within the perpetrator's knowledge, the pleading requirements are even less stringent, and Campbell, Jr. may plead fraudulent-concealment claims on information and belief. *United States ex rel. Willard v. Humana Health Plan, Inc.*, 336 F.3d 375, 385 (5th Cir. 2003). In *Silverman v. Watson Pharmaceuticals*, 2010 WL 11469548, *4 (S.D. Tex. 2010), Judge Gilmore of this Court explained that Rule 9(b) is flexible when necessary and concluded that "Plaintiffs pled their fraudulent misrepresentation and concealment claims based on the information available to them, which is sufficient to meet the Rule 9(b) specificity requirements under the circumstances."

### 1.2    Campbell, Jr.'s Second Amended Complaint satisfies Rule 9(b).

Campbell, Jr. stated his allegations of fraud and negligent misrepresentation with particularity, and he has provided Defendants with more than ample notice of the facts that comprise Campbell, Jr.'s claims. Although the Fifth Circuit has recognized that no single construction of Rule 9(b) applies in all contexts, and Campbell, Jr. can state his claims with particularity "without including all the details of any single court-articulated standard," *Grubbs*, 565 F.3d at 188, Campbell, Jr.'s Second Amended Complaint clearly alleges enough facts to show what Defendants contend is lacking, that is the "when," "where," and "how" the alleged fraud occurred.

Campbell, Jr. plainly alleges that the Williamses made fraudulent representations to Campbell, Sr. and failed to disclose and concealed other material information from Campbell, Sr. in the fall of 2015 through 2018, when the Williamses repeatedly asked Campbell, Sr. to

loan them money for Texas Tea's legitimate business operations. The Second Amended Complaint includes allegations regarding the timing of the Defendants' fraudulent conduct:

- "On or about July 15, 2014, the Williamses pitched their business opportunity to Campbell, Sr. and solicited his multi-million dollar investment in Texas Tea." (Doc. No. 30, Second Amended Complaint ¶ 10).

- "Less than eighteen months after the Williamses convinced Campbell, Sr. to make his $2 Million capital contribution, the Williamses came back to Campbell, Sr. for more money." (Doc. No. 30, Second Amended Complaint ¶ 29).

- "In 2015, Dymra Williams approached Campbell, Sr. again and held over his head the possibility of the Williamses soliciting outside investors and diminishing Campbell, Sr.'s interest in the company. The Williamses represented that Texas Tea needed more funding to operate." (Doc. No. 30, Second Amended Complaint ¶ 41).

- "After about one and one-half years of operating Texas Tea off of Campbell, Sr.'s initial $2 Million capital contribution, the Williamses suddenly asked Campbell, Sr. to loan Texas Tea more money. Jack and Dymra Williams **failed to disclose** to Campbell, Sr. that the Williamses were facing serious personal tax issues and that the Internal Revenue Service was bearing down on them which culminated in the Internal Revenue Service placing a lien on the Williamses' real property. Miraculously, the Williamses were able to pay off their nearly $50,000 tax assessment within days of receiving Campbell, Sr.'s first and second loan installments." (Doc. No. 30, Second Amended Complaint ¶ 156) (emphasis added).

- "Beginning in late-2015 and continuing through the first half of 2018, Jack and Dymra Williams approached Campbell, Sr. for more money—time and time again—after he already invested $2 Million in Texas Tea." (Doc. No. 30, Second Amended Complaint ¶ 155).

- "From December of 2015 until August of 2018, Campbell, Sr. performed his obligations under the notes by transferring the principal amounts to Texas Tea via wire transfer." (Doc. No. 30, Second Amended Complaint ¶ 31).

- "In late 2015, the Williamses approached Campbell, Sr. for more money. This was less than one and one-half years after Campbell, Sr.'s $2M capital contribution. On December 1, 2015, Campbell, Sr. wired $100,000 to Texas Tea, and Campbell, Sr. and Texas Tea entered into a promissory note for the company to repay the principal, plus interest." (Doc. No. 30, Second Amended Complaint ¶ 77).

- "Unbeknownst to Campbell, Sr., the Internal Revenue Service had just assessed nearly $50,000 in unpaid taxes, interest, and penalties against the Williamses. The Williamses failed to disclose this important fact to Campbell, Sr. The Williamses also failed to disclose that they would, or did, use Campbell, Sr.'s money paid to Texas Tea to satisfy the Williamses' serious tax assessment." (Doc. No. 30, Second Amended Complaint ¶ 78).

- "The IRS formally assessed the unpaid taxes against the Williamses on November 23, 2015, but, upon information and belief, representatives from the IRS had communicated with the Williamses before that date about their tax issues." (Doc. No. 30, Second Amended Complaint ¶ 79).

- "The Williamses' tax improprieties were so serious that the IRS placed a federal tax lien on the real property at which the Williamses resided. Shortly after the government placed a lien on the real property, the Williamses enticed Campbell, Sr. to loan more money to Texas Tea. Campbell, Sr. loaned another $100,000 to Texas Tea on January 13, 2016." (Doc. No. 30, Second Amended Complaint ¶ 80).

- "With their sudden receipt of Campbell, Sr.'s $200,000, and within thirty days of the Williamses receiving this money (through Texas Tea), the Williamses satisfied their significant tax obligations, and the IRS released the lien it had placed on the real property at which the Williamses lived." (Doc. No. 30, Second Amended Complaint ¶ 81).

- "Having the IRS in their rear-view mirror for the moment at least, the Williamses encouraged Campbell, Sr. to continue loaning money to Texas Tea, purportedly for its business operations, **on a nearly monthly basis**." (Doc. No. 30, Second Amended Complaint ¶ 82) (emphasis added).

- "Campbell, Sr. loaned Texas Tea $1.975 Million from the time the IRS assessed taxes and other amounts against the Williamses in late 2015 until September 2017, when the Williamses purchased a 4,300 square foot  home that is currently appraised at nearly $700,000." (Doc. No. 30, Second Amended Complaint ¶ 84).

Campbell, Jr.'s allegations satisfy Rule 9(b)'s particularity requirement. Campbell, Jr. alleges the Williamses made their material misrepresentations to Campbell, Sr. with the intent to induce Campbell, Sr. to loan Texas Tea substantial sums of money. *Id.* ¶ 154. Defendants' scheme started in late-2015 when the IRS began applying pressure on them, assessing penalties on them for unpaid taxes, and filing a lien on their real property. *Id.* ¶¶ 77–84, 156; *see Rangel*

*v. Adtalem Glob. Educ., Inc.*, 2019 WL 6828298, at *3 (W.D. Tex. 2019) (denying motion to dismiss because, among other things, plaintiffs identified "the approximate date of the fraudulent representation"). To induce Campbell, Sr. to loan them money on a nearly monthly basis, the Williamses represented to Campbell, Sr. that they needed more money to operate Texas Tea and that they would use Campbell, Sr.'s money on legitimate business expenses. ¶ 155. Defendants' fraudulent scheme continued for approximately two and one-half years until Campbell, Sr. told the Williamses, "no more." ¶ 48; *US ex rel. Foster v. Bristol-Myers Squibb Co.*, 587 F. Supp. 2d 805, 821–22 (E.D. Tex. 2008) (citing cases relaxing pleading standard when fraud occurs over extended period of time).

Less than two months ago, a district court in this circuit denied a pipe manufacturer's motion to dismiss a residential homebuilder's fraud and negligent misrepresentation claims. *Gehan Homes, Ltd. v. NIBCO Inc.*, 2020 WL 5110707, at *13 (W.D. Tex. 2020). Eighteen homeowners experienced water damage from leaky pipes that the defendant manufactured, and the homeowners assigned their claims to the plaintiff homebuilder. *Id.* at *1. The homes were built between 2008 and 2013, and developer alleged the pipe manufacturer committed fraud and negligent misrepresentation when it induced consumers to purchase the piping by claiming it complied with various internationally-recognized standards and certifications. *Id.* The manufacturer moved to dismiss the fraud and negligent misrepresentation claim under Rule 9(b), but the court denied the motion and found the complaint "as a whole sufficiently states that Defendant engaged in the alleged conduct from 2008 through 2012." *Id.* at *12. Campbell, Jr.'s complaint alleges similar misconduct by the Defendants from November of 2015 through 2018, but Defendants refuse to shine a light on their precise misconduct.

Defendants cite *Masel* and states that a party claiming fraud by omission or nondisclosure needs to plead when the missing disclosure should have been made. *See* TTR MTD at 8, 9; *Masel v. Villarreal*, 924 F.3d 734, 749 (5th Cir. 2019). *Masel* was a securities fraud case that Fifth Circuit described as having "unusual facts" and a "particularly vexing" and "highly counterintuitive" analysis. *Masel*, 924 F.3d at 744. Unlike the *Masel* plaintiffs' silent complaint about when the defendant should have disclosed an intent to form a competing business, Campbell, Jr. did allege when Defendants should have told Campbell, Sr. about Defendants' true intentions for Campbell, Sr.'s money and the Williamses' precarious position with the IRS. *See* [Doc. 30] Second Amended Complaint ¶¶ 77–84, 154–159. Campbell, Jr. plainly alleged that the Williamses should have made full disclosures to Campbell, Sr. "before inducing him to loan substantial sums of money to Texas Tea." *Id.* ¶ 157. Campbell, Jr. also alleged that had the Williamses made the mandatory disclosures to Campbell, Sr.—as opposed to the partial, misleading story about what they planned to do with Campbell, Sr.'s money— "Campbell, Sr. would not have loaned Texas Tea another $2.375 Million." *Id.* ¶ 159.

Defendants also rely on *Gage*, but that case does not warrant dismissal here either. *See* TTR MTD at 7–8; *U.S. ex rel. Gage v. Davis S.R. Aviation, L.L.C.*, 623 F. App'x 622, 627 (5th Cir. 2015). *Gage* was a qui tam case under the False Claims Act that involved the maintenance of military aircraft in a war zone. *Id.* at 623. Gage alleged the defendants were part of a scheme to defraud the government by using non-conforming aircraft parts on an airliner that exploded over Afghanistan. *Id.* at 624. Gage asserted an implied false certification theory to impose liability under the FCA, but Gage did not plead what was false about the defendants' requests for reimbursement from the government. *Id.* at 625–26. Gage did not identify the statute that

the defendants purportedly violated. *Id.* at 626. The district court also dismissed Gage's FCA claim because Gage did not specify when the defendants presented their invoices to the government for payment. *Id.* at 627. The court found Gage's allegation that the defendants submitted their invoices between 2009 and 2011 was not specific enough to satisfy Rule 9(b).

Unlike *Gage*, Campbell, Jr. specified Defendants' misrepresentations and omissions started in late-2015 when Defendants approached Campbell, Jr. for more money and continued throughout 2018 when the Williamses repeatedly approached Campbell, Sr. for more money. Defendants continued their fraudulent scheme to enrich themselves throughout 2016, 2017, and part of 2018 by misrepresenting their true intentions for Campbell, Sr.'s money and telling him that Defendants would use Campbell, Sr.'s money for legitimate business expenses, as opposed to paying the Williamses' personal tax obligations and penalties, removing federal tax liens that had been placed on their real property, purchasing a $700,000 home, lining their pockets, and likely making other undisclosed transfers to the Williamses and companies they controlled. [Doc. 30] ¶¶ 47, 84, 155.

Notwithstanding Campbell, Jr.'s particular allegations, the facts relating to Defendants' fraud are peculiarly within Defendants' knowledge and control, which should further relax the pleading standard. While the information is in their possession, Defendants have stonewalled Campbell, Jr. and refused to produce the documents that they exchanged with Campbell, Sr. about the promissory notes, claiming "[t]he documents exchanged by the parties leading up to the signing of the promissory notes are not relevant." ***Exhibit A*** at RFP #11. Campbell, Sr. passed away in 2018, and Campbell, Jr. does not possess the information he requested the Defendants to produce.

13

In addition to the above-mentioned allegations, the Second Amended Complaint contains other allegations that shed light on Defendants' scheme, including when and how they orchestrated it.

- "Separate from their fiduciary and confidential relationship with Campbell, Sr., Jack and Dymra Williams also **had a duty to disclose** the entire truth about their planned uses for Campbell, Sr.'s loan proceeds. Jack and Dymra **voluntarily and partially disclosed information** to Campbell, Sr. about Texas Tea's need for a capital infusion, but Jack and Dymra Williams **failed to disclose the whole truth**. Additionally, Jack and Dymra Williams only **partially disclosed** to Campbell, Sr. that the Williamses intended to use his loan proceeds for Texas Tea's legitimate business operations and **created a false impression** that Campbell, Sr.'s loan proceeds would be used solely for that purpose, as opposed to personally enriching Jack and Dymra Williams. Despite their duties to speak and to disclose the whole truth, Jack and Dymra Williams failed to do so." (Doc. No. 30, Second Amended Complaint ¶ 158) (emphasis added).

- "Jack and Dymra Williams represented to Campbell, Sr. that Texas Tea needed more money to operate the business and become profitable. Jack and Dymra Williams represented to Campbell, Sr. that Texas Tea and the Williamses would use Campbell, Sr.'s loan proceeds on legitimate business expenses. Upon information and belief, Jack and Dymra Williams knew, at the time they made these representations to Campbell, Sr. to entice him to loan Texas Tea more money, they did not intend to use all of Campbell, Sr.'s loan amounts to operate Texas Tea. To the contrary, upon information and belief, Jack and Dymra Williams knew when they made their representations to Campbell, Sr. to induce him to loan Texas Tea millions of more dollars that they planned to enrich themselves personally with Campbell, Sr.'s money and spend his loan proceeds on personal expenditures, including to satisfy at least one personal tax lien, to excessively compensate themselves, and to help them purchase a 4,300 square foot home that is now appraised at nearly $700,000." (Doc. No. 30, Second Amended Complaint ¶ 155).

- "Texas Tea and the Williamses defrauded Campbell, Sr. by using funds earmarked for Texas Tea's business operations on the Williamses' excessive compensation and their personal uses and expenses. Texas Tea and the Williamses certainly concealed and failed to disclose to Campbell, Sr. that Defendants would use the loan proceeds to excessively and unreasonably compensate the Williamses or to pay outstanding individual tax assessments and liens that the Williamses were facing." (Doc. No. 30, Second Amended Complaint ¶ 160).

- "Campbell, Sr. justifiably relied on Texas Tea's and the Williamses' representations that they would use Campbell, Sr.'s loan proceeds on legitimate operating expenses, but

their representations were   false. Had Jack and Dymra Williams not made their misrepresentations and fully disclosed what they planned to do with Campbell, Sr.'s money, Campbell, Sr. would not have loaned Texas Tea another $2.375 Million." (Doc. No. 30, Second Amended Complaint ¶ 159).

Campbell, Jr.'s allegations are more than sufficient to alert Defendants to the facts surrounding Campbell, Jr.'s claims. As Judge Gilmore found in *Silverman*, Campbell, Jr. has pleaded his claims "based on the information available to [him], which is sufficient to meet the Rule 9(b) specificity requirements under the circumstances." The Second Amended Complaint goes further than providing all that is required—a "brief sketch" of Defendants' fraud. *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 540 F. Supp. 2d at 765. And, Campbell, Jr.'s allegations do not reflect that his claims lack any "reasonably founded hope of substantiation" after the discovery process. *See Colonial Oaks*, 972 F.3d at 687. The Court, therefore, should deny Defendants' motion.

### 1.3    Campbell, Jr.'s Complaint alleges facts to support his claims regarding Defendants' fraudulent intent and Campbell, Sr.'s reliance.

Defendants also allege that Campbell, Jr.'s allegations do not establish or raise an inference of fraudulent intent by Defendants and reliance by Campbell, Sr. TTR MTD at 10–11.  Campbell, Sr. died in 2018 and his Estate brought this lawsuit on his behalf. The facts relating to Defendants' fraud are peculiarly within their knowledge, rather than Campbell, Jr.'s. Thus, Campbell, Jr.'s pleading obligations are relaxed. *See Humana Health Plan of Tex. Inc.*, 336 F.3d at 385. Additionally, intent may be alleged generally. FED. R. CIV. P. 9(b).

Campbell, Jr. has alleged specific facts to support an inference of fraud. This may be accomplished if Campbell, Jr. shows either (1) the Defendants' motive to commit fraud or (2) circumstances that would should Defendants' conscious behavior. *Hannie Dev'l, Inc.*, 972 F.3d

at 689–90. Defendants' motive can be revealed by identifying the benefits they realized by their false statements and wrongful nondisclosures. *Mun. Employees' Ret. Sys. of Michigan v. Pier 1 Imports, Inc.*, 935 F.3d 424, 430–31 (5th Cir. 2019). Campbell, Jr. has done that.

Campbell, Jr. alleges that his father was Texas Tea's sole investor in 2014 whose $2 Million capital contribution capitalized the company. [Doc. 30] Second Amended Complaint ¶¶ 21, 28. The Williamses then used Campbell, Sr.'s capital contribution to pay themselves great sums of money (the extent to which Defendants still have refused to disclose) while Texas Tea suffered greater and greater annual losses. *Id.* ¶¶ 37–44. The Williamses apparently failed to pay their personal tax obligations and, around November of 2015, (unbeknownst to Campbell, Sr.) the IRS assessed tax penalties on the Williamses and filed a lien on their real property. *Id.* ¶¶ 78–80. The Williamses were desperate for financial help and told Campbell, Sr. that they needed more money to run Texas Tea. *Id.* ¶¶ 29, 76–84.

Even though their company has never been profitable—in fact, losing millions of dollars—the Williamses somehow were able to pay off the first tax lien within thirty days of Campbell, Sr. providing Texas Tea loans of $200,000. *Id.* ¶¶ 80–81. The next year, the IRS assessed an even greater sum against the Williamses for unpaid taxes, interest, and penalties. ¶ 83. The next year, and while the Williamses continued seeking loans from Campbell, Sr. (and, again, unbeknownst to Campbell, Sr.), the Williamses failed to pay their personal tax obligations, and the IRS placed another federal tax lien on the Williamses' property. *Id.* ¶ 83. At the same time Texas Tea was suffering millions of dollars of losses and the Williamses were requesting more loans from Campbell, Jr. for Texas Tea's operations, the Williamses purchased a 4,300 square foot home that is currently appraised at nearly $700,000. *Id.* ¶¶ 84–

85. Campbell, Jr. also alleges that the Williamses used Campbell, Sr.'s money on other personal expenses, but Defendants have refused to disclose all amounts they received from Texas Tea. *Id.* ¶¶ 38, 45, 47, 57–59.

Campbell Jr. alleges that the Williamses knew, at the time they made their representations to Campbell, Sr. to entice him to loan Texas Tea more money, the Williamses did not intend to use all of Campbell, Sr.'s loan amounts to operate Texas Tea. *Id.* ¶ 155. Campbell, Jr. also alleges that the Williamses knew when they made their partial representations to Campbell Sr. that they planned to enrich themselves personally with Campbell, Sr.'s money and spend his loan proceeds on personal expenditures, including to satisfy at least one personal tax lien, to excessively compensate themselves, and to help them purchase a 4,300 square foot home that is now appraised at nearly $700,000. *Id.* ¶ 155.

Campbell, Jr.'s factual allegations reveal Defendants' motive to commit fraud and set forth the circumstances showing Defendants' conscious behavior. *See Hannie Dev'l, Inc.*, 972 F.3d at 689–90. The convenient timing of the Williamses' requests for funds, the timing of the IRS filing liens on the Williamses' property, Texas Tea's historical operational losses, the close timing of the IRS releasing the first lien on the Williamses' property compared to Campbell, Jr.'s first two loans, the Williamses' purchase of a large, expensive home, the Williamses' initial promise to provide Texas Tea's financial information to Campbell, Jr. and then the Williamses' refusal, Texas Tea's continued refusal to produce documents it exchanged with Campbell, Sr. about the entry of the promissory notes, the Williamses' ever increasing salaries despite the company's ever-rising losses, and Texas Tea's refusal to admit or deny that it issued a W-2 or 1099 to the Williamses to reflect payments to the Williamses in excess of their K-1

distributions are all sufficient to show Defendants' motive to commit fraud, but they certainly raise an inference of fraudulent intent. *See Gehan Homes, Inc.*, 2020 WL 5110707, at *12 (denying motion to dismiss after finding "it is apparent that Defendant allegedly benefits from the alleged fraud and misrepresentations).

Defendants also challenge the sufficiency of Campbell, Jr.'s reliance allegations. TTR MTD at 10–11. But "[r]eliance is ordinarily a question for the fact-finder." *Celanese Corp. v. Coastal Water Auth.*, 475 F. Supp. 2d 623, 638 (S.D. Tex. 2007). Therefore, the reliance element for a fraud or misrepresentation claim is not properly resolved on the pleadings. *Id.* (denying motion to dismiss fraud claim because reliance question was "not properly before the court on this motion to dismiss"). Moreover, courts have recognized that it is "inherently true of reliance allegations" that they are conclusory. *See In re Enron Corp. Sec., Derivative & ERISA Litig.*, 2010 WL 9077875, at *31 (S.D. Tex. 2010) (quoting *Steiner v. Southmark Corp.*, 734 F. Supp. 269, 275 (N.D. Tex. 1990)). "One either relies on a particular statement or one does not, there is no middle ground." *Steiner*, 734 F. Supp. at 275. Just as the *Steiner* court found the plaintiffs' allegations of reliance withstood Rule 9(b) scrutiny, so too should this Court find Campbell, Jr.'s allegations.

Regardless of the threshold determination of this *factual* issue, Campbell, Jr. actually pleaded sufficient facts to raise an inference of Campbell, Sr.'s reliance on the Williamses' representations. The Second Amended Complaint alleges that Campbell, Sr. relied on Defendants' representations that they would use his loan proceeds on legitimate operating expenses in deciding whether to loan money to Texas Tea. [Doc. 30] Second Amended

Complaint ¶¶ 155, 156, 159, 163, 169. Campbell, Jr.'s most salient allegation in this regard is as follows:

> Campbell, Sr. justifiably relied on Texas Tea's and the Williamses' representations that they would use Campbell, Sr.'s loan proceeds on legitimate operating expenses, but their representations were false. **Had Jack and Dymra Williams not made their misrepresentations and fully disclosed what they planned to do with Campbell, Sr.'s money, Campbell, Sr. would not have loaned Texas Tea another $2.375 Million.**

*Id.* ¶ 159 (emphasis added). The Second Amended Complaint also alleges that Campbell, Sr. relied on Defendants' representations when he entered into the promissory notes and wired the money to Texas Tea. *Id.* ¶ 163. Campbell, Sr. transmitted the money to Texas Tea not the Williamses. *Id.* ¶¶ 31, 77. Defendants will have an opportunity to explore this element of Campbell, Jr.'s claim, but it is improper at this pleading stage to decide, as Defendants would have it, whether Campbell, Sr. "cared" why Texas Tea needed the funds or how Texas Tea (or the Williamses) would use Campbell, Sr.'s funds. *See* TTR MTD at 11.

Campbell Jr. has provided the Court and TTR with much more than a "brief sketch" of the fraud Defendants perpetrated during their business relationship with Campbell, Sr. Campbell, Jr.'s complaint satisfies Rule 9(b). Therefore, the Court should deny Defendants' Motion to dismiss Campbell, Jr.'s fraud and negligent misrepresentation claims.

### 1.4 The Second Amended Complaint states with particularity Campbell, Jr.'s fraudulent transfer and conveyance claims.

Campbell, Jr. has particularly stated plausible claims for actual and constructive fraudulent transfers and conveyances. An actual fraudulent transfer claim has the following elements: (1) a creditor; (2) a debtor; (3) the debtor transferred assets shortly before or after the creditor's claim arose; (4) with actual intent to hinder, delay, or defraud any of the debtor's

creditors. *Matter of Life Partners Holdings, Inc.*, 926 F.3d 103, 117 (5th Cir. 2019). Defendants only contend that Campbell, Jr. failed to allege facts as to "what" was fraudulently transferred and "when" it was transferred, and that Campbell did not allege facts that raise an inference that Defendants intended to defraud Campbell, Sr. TTR MTD at 16.[3]

The Second Amended Complaint alleges approximately how much money Texas Tea and the Williamses transferred to the Williamses, and when those transfers occurred. Campbell, Jr. alleges a pattern of fraudulent conduct and transfers from Texas Tea to the Williamses. Campbell, Jr. alleges that the Williamses used Campbell, Sr.'s initial $2 Million capital contribution in Texas Tea to unjustly enrich and excessively compensate the Williamses. *Id.* ¶¶ 37–46, 76, 105, 106, 155, 158, 160. At least from 2014 through 2018, as Texas Tea had worse and worse performance and greater and greater annual losses, Texas Tea fraudulently transferred its assets to the Williamses to avoid Texas Tea's largest creditor (Campbell, Sr.). *Id.* ¶¶ 37–46.

Campbell, Jr. further alleges that Texas Tea fraudulently transferred Campbell, Sr.'s loan payments in 2015, 2016, 2017, and 2018 to the Williamses to avoid Texas Tea's largest creditor, Campbell, Sr., and to enrich themselves. The fraudulent transfers only recently discovered include payments Campbell, Sr. made for Texas Tea's legitimate business operations that Texas Tea (through the Williamses) funneled to the Williamses to pay personal expenses, including personal taxes, penalties, interest that had led the IRS to file a lien on the

---

[3] Defendants do not challenge other elements of Campbell, Jr.'s claims, such as the existence of a debtor, creditor, or transfer.

Williamses' real property and the purchase of a $700,000 home in September of 2017. *Id.* ¶¶ 76, 78-81, 84-85.

Information that will further reveal all of Texas Tea's fraudulent transfers and conveyances to the Williamses lies exclusively in Defendants' possession, which Defendants have refused to disclose. And no wonder. The Williamses never disclosed to Campbell, Sr. that Texas Tea would use his loan payments to satisfy the Williamses' personal tax obligations and penalties or, while Texas Tea was losing millions of dollars, allow the Williamses to purchase a $700,000 home. *Id.* ¶¶ 84–86, 105, 155, 156, 160. Campbell, Jr. also alleges that Texas Tea transferred sales proceeds from real property and an equipment trailer to the Williamses just days after Campbell, Sr. passed away in December of 2018. *Id.* ¶ 86. These portions of Defendants' scheme to defraud Texas Tea's creditors only surfaced during the life of this legal proceeding and through no aid of Defendants. *Id.* ¶¶ 38, 45, 78, 105, 156–161. Texas Tea also never disclosed how much its insiders (the Williamses) took from Texas Tea. *Id.* ¶ 38. Campbell Jr. further alleges, upon information and belief, the Williamses caused Texas Tea to transfer some of its assets, including money, to other companies the Williamses controlled or in which they have an interest. *Id.* ¶ 47.

Because courts recognize that direct evidence of actual fraud is "scarce," courts consider a nonexhaustive list of factors when determining whether a debtor actually intended to defraud its creditors. *In re Ritz*, 832 F.3d 560, 568 (5th Cir. 2016). Parties adequately allege actual fraudulent transfer claims when they allege the other party made a transfer with the actual intent to defraud the plaintiff and identify several badges of fraud. *E.g., Sourcing Mgmt., Inc. v. Simclar, Inc.*, 118 F. Supp. 3d 899, 917 (N.D. Tex. 2015). This much, Campbell, Jr. has

done. Only a few of the badges of fraud are necessary to support an inference of fraud. *Soza v. Hill,* 542 F.3d 1060, 1066–67 (5th Cir. 2008).

Campbell, Jr. alleges that Texas Tea's transfers to the Williamses (made by the Williamses) were done with the actual intent to hinder, delay, and defraud Campbell, Sr., Texas Tea's largest creditor. [Doc. 30] ¶¶ 36, 119, 142. The transfers bear numerous hallmarks of fraudulent intent, including that (i) they were made to insiders, (ii) Texas Tea functionally retained control over the transferred property after the transfers, (iii) Texas Tea and the Williamses concealed (and continue to conceal) the circumstances and nature of the transfers from Campbell, Sr. and Campbell, Jr., (iv) the transfers divested Texas Tea of all or a substantial part of its material assets, (v) Texas Tea concealed its assets from Campbell, Sr. and Campbell, Jr.; (vi) Texas Tea was insolvent shortly after or at the time of the transfers to the Williamses; and (vii) Texas Tea's transfers to the Williamses occurred shortly before or shortly after Texas Tea incurred a substantial debt to Campbell, Sr. *Id.* ¶ 113, 120.

Campbell, Jr.'s allegations are more than sufficient to state a plausible claim for actual fraudulent transfers. *See Fawaz v. Byers*, 2014 WL 6473272, at *5 (S.D. Tex. 2014) (denying motion to dismiss because party pleaded several badges of fraud to state actual fraudulent transfer claim); *Janvey v. Bogar*, 2014 WL 4907074, at *2 (N.D. Tex. 2014) (finding party stated TUFTA claim against wife who was alleged to have received indirect transfers of financial proceeds); *U.S. Bank Nat. Ass'n v. Verizon Commc'ns Inc.*, 817 F. Supp. 2d 934, 942 (N.D. Tex. 2013 )(alleging four badges of fraud is  sufficient to plead a claim of actual intent fraudulent transfer). The Court should deny the motion as to the actual fraudulent transfer claims.

Defendants' efforts to dismiss Campbell, Jr.'s constructive fraudulent transfer claims should fare no better. In addition to pleading fraudulent intent for the actual fraudulent transfer claims, Campbell, Jr. also pleaded facts that, if true, will demonstrate a lack of reasonably equivalent value for the transfer; and Texas Tea was "financially vulnerable" or insolvent at the time of the transaction. *Matter of Life Partners Holdings, Inc.*, 926 F.3d at 120.

Defendants do not dispute that Texas Tea was insolvent or financially vulnerable. Instead, Defendants wish for the Court to require Campbell, Jr. to *prove* that Texas Tea did not receive reasonably equivalent value for the unjust sums the Williamses took from Texas Tea. The Second Amended Complaint alleges that the transfers were made without an exchange of reasonably equivalent value, and Campbell, Jr. provided factual allegations to support his claims. [Doc. 30] ¶¶ 37, 39-40, 44, 51-52, 76-81, 84-85, 115, 126, 133. Campbell, Jr. alleges the Williamses self-servingly took "grossly excessive and disproportionate compensation." *Id.* ¶ 105. Texas Tea never earned any regular revenue, nor did Texas Tea make any distributions to Campbell, Sr., *id.* ¶¶ 51–52, but yet Texas Tea made millions of dollars in transfers to the Williamses to enrich themselves *personally* (¶ 76), satisfy *personal* tax delinquencies (¶ 86), purchase an expensive, *personal* residence (¶ 155), and to take sale proceeds from company assets for their *personal* benefit (¶ 86). *See also id.* ¶¶ 37, 39-40, 44, 76-81, 84-85.

It is reasonable to infer that for Texas Tea and the Williamses to transfer such a substantial sum to the Williamses, individually and for these reasons, and not disburse any money to Campbell, Sr., while Texas Tea is so apparently failing as a business, that the

Williamses did not provide Texas Tea with reasonably equivalent value, and the transfers were instead made for fraudulent reasons.

### 1.5 Defendants cannot show it is evident that Campbell, Jr.'s claims are time barred.

Defendants prematurely ask the Court to rid the Defendants of Campbell, Jr.'s substantial claims by arguing at the pleading stage that some of Campbell, Jr.'s claims are untimely. The Court should not hastily dismiss Campbell, Jr.'s claims before the discovery phase. Time barred claims should only be dismissed at this stage when it is "evident from the plaintiff's pleadings" that the action is barred *and* the pleading does not raise a basis for "tolling or the like." *NIBCO Inc.*, 2020 WL 5110707, at *4. Campbell, Jr. was not required to plead the discovery rule, *Colonial Penn Ins. Co. v. Mkt. Planners Ins. Agency, Inc.*, 1 F.3d 374, 376 (5th Cir. 1993), but his allegations make clear that the Defendants have hidden their misconduct, Campbell, Jr. has not had a reasonable opportunity to discover the extent of Defendants' unlawful conduct. This Court should follow *Curtis v. Cerner Corporation*, __ F. Supp. 3d __, 2020 WL 4934950, at *4 (S.D. Tex. 2020) and "await further factual development" before ascertaining whether any claim is time barred. "Dismissal should be granted 'only when the plaintiff's potential rejoinder to the affirmative defense was foreclosed by the allegations in the complaint.'" *Id.* Campbell, Jr.'s Complaint does not effectively plead him out of court, so the Court should not grant Defendants' motion on this ground. *See id.*

Campbell, Jr. did not discover, and could not with the exercise of reasonable diligence have discovered, the extent of Defendants' misconduct. And Campbell, Jr. still has not been able to do so given Defendants' stonewalling. Nevertheless, Campbell, Jr. has identified fraudulent transfers within the limitations period. And, upon factual development, the Court

will need to take into account tolling rules as to Campbell, Sr.'s passing, TEX. CIV. PRAC. & REM. CODE § 16.062, as well as the Supreme Court of Texas's tolling orders due to the COVID-19 pandemic before this Court should ascertain this particular issue. Campbell, Jr. has not evidently pleaded himself out of court.

Campbell, Jr. alleges that Defendants' fraudulent transfers occurred between 2014 and 2018. *See* [Doc. 30] Second Amended Complaint ¶¶ 37, 39-40, 44, 76-81, 84-85. Although Campbell, Jr. is unable to provide specific dates for all of Defendants' fraudulent transfers at this time, it would be inequitable to grant Defendants' motion on these grounds. As the participants involved in these transfers, Defendants are in the best position to know exactly when the allegedly fraudulent transfers occurred. Campbell, Jr. repeatedly asked Defendants to provide information about the transfers, but Defendants refuse to provide the requested information. *Id.* ¶¶ 45, 57-59. Thus, it would be unjust to dismiss this claim until Campbell, Jr. can obtain additional information on the transfers through the discovery process.

### 1.6    Campbell, Jr. plausibly alleges the elements of his negligent misrepresentation claim.

Campbell, Jr. alleges a plausible negligent misrepresentation claim against Texas Tea and the Williamses. Texas Tea includes its negligent misrepresentation argument within its fraud argument, misrepresenting to the Court that the Rule 9(b) heightened pleading standard for fraud applies to a claim for negligent misrepresentation as well.   Defs' MTD 7-13. However, under Fifth Circuit precedent, negligent misrepresentation claims are not fraud, and therefore the Rule 9(b) heightened pleading standard does not apply. *See Posey*, 415 F3d at 394 (holding that state-law negligent misrepresentation is not a fraud claim and therefore not subject to Rule 9(b)). To state his claim for negligent misrepresentation, Campbell Jr. is not

required to outline every element of his claim. *Innova Hosp. San Antonio, L.P. v. Blue Cross & Blue Shield of Ga., Inc.*, 995 F. Supp. 2d 587, 603 (N.D. Tex. 2014). Rather, Campbell, Jr. must provide enough factual allegations to draw a reasonable inference that the elements of his claim exist. *Id.*

A negligent misrepresentation claim has four elements: (1) the representation is made by a defendant in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplies "false information" for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation. *Posey*, 415 F.3d at 395–96.

Here, Campbell, Jr. has properly stated a claim for negligent misrepresentation. Campbell, Jr. alleges that Texas Tea (through the Williamses) made misrepresentations to Campbell, Sr. to guide him to invest in Texas Tea; including, representing that Texas Tea conservatively would earn $21 Million to $29 Million net profit in the first fourteen to fifteen months, representing that they had customers "anxiously awaiting their work," and representing that they needed additional capital to operate Texas Tea. *See* [Doc. 30] ¶¶ 13-14, 29, 41, 166. Campbell, Jr. alleges Defendants did not exercise reasonable care in communicating this information because they failed to disclose that they indented to use the loaned funds for personal reasons including paying themselves considerable salaries, paying off an IRS tax lien, and purchasing a house. *See id.* ¶¶ 37-44, 78-81, 84-85, 168. Campbell, Jr. further alleges that Campbell, Sr. and the Estate suffered pecuniary loss by justifiably relying on Defendants' information, as Texas Tea has not paid Campbell, Sr. or his Estate any of the

principal, interest, or fees that are due on the twenty-eight notes, or provided any disbursements from the initial investment. *See id.* ¶¶ 52, 75, 169-170.

Campbell Jr's Second Amended Complaint contains allegations making its negligent misrepresentation claim plausible on its face. As identified above, Defendants overlook or disregarded Campbell, Jr.'s many allegations which support his negligent misrepresentation claim. *See id.* ¶¶ 13-14, 29, 37-44, 78-81, 84-85, 166, 168-170.  Thus, the Court should deny Defendants' Motion to dismiss this claim.

**2.     Any additional information needed to plead fraud is exclusively within Defendants' control, and they refuse to disclose it.**

As shown above, Campbell, Jr. has pleaded more than sufficient facts in his Second Amended Complaint to satisfy the applicable pleading standard with respect to his claims. Nonetheless, should the Court disagree, it should consider the fact that any deficiencies in Campbell, Jr.'s Complaint are the result of his inability to obtain essential information and documents from Defendants. *See United States ex rel. Willard v. Humana Health Plan, Inc.*, 336 F.3d 375, 385 (5th Cir. 2003). As noted above, in keeping with the Williamses' historical pattern of attempting to hide their tortious actions, Defendants have refused to produce requested information and documents about the Williamses' pilfering of Texas Tea's funds. [Doc. 30] Second Amended Complaint ¶¶57–59. Nor have the Williamses produced any of the documents they are required to produce with their Initial Disclosures.

The Court should not countenance Defendants' use of the discovery process as both a sword and a shield. Defendants resisted all discovery that relates to the claims they seek to dismiss—claiming Campbell, Jr.'s discovery requests "are not relevant"—and yet they rhetorically ask about emails, notes, and telephone calls that are exclusively in Defendants'

possession, which they refuse to produce. *See* ***Exhibit A*** at RFP Nos. 10, 11, 25, 31; TTR

MTD at 9.

The Williamses exercised control over Texas Tea's business affairs and did not include

Campbell, Sr. in all of Texas Tea's business decisions and transfers of money and assets."

[Doc. No. 30] Second Amended Complaint ¶¶ 20, 46. Moreover, the Williamses and Campbell,

Sr. were in unequal positions of power and not merely co-equal members of Texas Tea. *Id.* ¶

100. The Williamses actively exercised superior control over Texas Tea's business operations.

*Id.* They did not exercise a simple, nonpassive role in Texas Tea. *Id.*

Despite this, Texas Tea refuses to produce discoverable information related to the

Williamses' communications with Campbell, Sr. regarding the promissory notes because Texas

Tea claims "[t]he documents exchanged by the parties leading up to the signing of the

promissory notes are not relevant." ***Exhibit A*** at RFP #11. Campbell, Jr. amended his

complaint to make clear that such documents are relevant and discoverable, [Doc. No. 30]

Second Amended Complaint ¶ 59, but Texas Tea still refuses to produce the information that

only it possesses. That is not all.

Texas Tea also is shielding documents it exchanged about the amount of

compensation, guaranteed payments, or distributions that Texas Tea made to the Williamses

in 2015, 2016, 2017, and 2018, as those that concern Texas Tea's reporting, calculating, or

substantiating of the Williamses' liabilities and capital accounts with Texas Tea. ***Exhibit A*** at

RFP Nos. 10, 38, 40–63. Texas Tea refuses to *either* admit or deny that it issued a Form W-2

Wage and Tax Statement to the Williamses during the years Campbell, Sr. loaned Texas Tea

money (2015–2018). ***Exhibit B*** at RFA Nos. 15, 16. TTR also refuses to *either* admit or deny

that it issued a Form 1099-MISC Miscellaneous Income to the Williamses during the years Campbell, Sr. loaned Texas Tea money (2015–2018). *Id.* at RFA Nos. 17, 18. Texas Tea issued IRS Schedule K-1s (Form 1065) to the Williamses in years 2014–2018 that listed the distributions Texas Tea made to them. But Texas Tea refuses to *either* admit or deny that it paid the Williamses any compensation, wages, or earnings in those years in addition to the distributions reflected on their annual K-1s. *Id.* at RFA Nos. 19–28.

Given Defendants' continued efforts to stonewall discovery, if the Court is not satisfied with the sufficiency of the pleading in the Second Amended Complaint, Campbell, Jr. requests that the Court defer ruling on Defendants' motions until Campbell, Jr. has received and reviewed essential communications, documents, and information from Defendants (both internally and between Defendants and Campbell, Jr.) and been given an opportunity to supplement its pleading on this issue.

### 3.     Alternatively, the Court Should Grant Campbell, Jr. Leave to Amend.

Campbell, Jr. has satisfied his notice pleading requirements and particularly alleged plausible fraud and negligent misrepresentation claims. No more should be required of him. However, if the Court disagrees, Campbell, Jr. requests leave to amend. As the Fifth Circuit has declared, "[a]lthough a court may dismiss the claim, it should not do so without granting leave to amend, unless the defect is simply incurable or the plaintiff has failed to plead with particularity after being afforded repeated opportunities to do so." *Hart v. Bayer Corp.*, 199 F.3d 239, 247 n.6 (5th Cir. 2000). As one judge of this Court has explained, "even in the case of dismissal for failure to meet heightened pleading requirements, Plaintiffs should be given leave to amend unless doing so would be futile." *99869 Canada, Inc. v. Global Sec. Networks, Inc.*, 2016

WL 7319302, at *5 (S.D. Tex. 2016) (Lake, J.). Thus, if the Court concludes that Rule 9(b) requires more pleading, Campbell, Jr. respectfully requests leave to amend to address the Court's concerns.

**CONCLUSION**

For the foregoing reasons, Campbell, Jr. adequately alleges each element of his claims for relief. Campbell, Jr.'s claims have facial plausibility because, as plead, the Court can draw a reasonable inference that Defendants are liable for the misconduct Campbell, Jr. alleges. The Court should deny Defendants' Motion in its entirety and award Campbell, Jr. all other relief to which the Court finds him entitled.  To the extent that the Court finds merit in Defendants' Motion, Campbell, Jr. respectfully requests the Court for leave to amend his Complaint and cure any deficiency.

Respectfully submitted,

**CHAMBERLAIN, HRDLICKA, WHITE,
WILLIAMS & AUGHTRY, P.C.**

By: ___/s/Kellen R. Scott_____
    Kellen R. Scott
    Attorney-in-Charge
    Texas State Bar No. 24070579
    S.D. Tex. ID No. 1054528
    1200 Smith Street, Suite 1400
    Houston, Texas 77002
    Telephone: (713) 658-1818
    Facsimile: (713) 658-2553
    kellen.scott@chamberlainlaw.com

**ATTORNEYS FOR PLAINTIFF**

**OF COUNSEL:**
Ryan Oliver Cantrell
Texas State Bar No. 24055259
S.D. Tex. ID No. 612310
**CHAMBERLAIN, HRDLICKA, WHITE,**
    **WILLIAMS & AUGHTRY, P.C.**
1200 Smith Street, Suite 1400
Houston, Texas 77002
Telephone: (713) 658-1818
Facsimile: (713) 658-2553
ryan.cantrell@chamberlainlaw.com

## Certificate of Service

I hereby certify that a correct copy of the foregoing has been forwarded to the following parties through the Court's CM/ECF system or via electronic mail on October 13, 2020:

| | |
|---|---|
| Jeffrey R. Elkin | Andy Soto |
| Penn C. Huston | MILLS SHIRLEY LLP |
| MOUERHUSTON PLLC | 2228 Mechanic St., Ste. 400 |
| 349 Heights Blvd. | Galveston, Texas 77550 |
| Houston, Texas 77007 | |

                    /s/Kellen R. Scott